May it please the Court, my name is Michael Payne and I represent Tyler Construction Company. This is a case that arises from a somewhat unusual type of procurement for construction called an indefinite delivery, indefinite quantity contract that then was turned into what's referred to as a MATOC contract, a multiple award task order contract. Up to about perhaps six or seven years ago, virtually every construction contract awarded by the Corps of Engineers and most federal construction agencies was done on the basis of sealed bidding, where the low bidder received the award. Gradually over the period of the last five or six years there's been a shift to a far greater use of contracting by negotiation under FAR Part 15, where awards are made on a best value basis. The real question here is why can't the government adopt what may be a unique, new, innovative way of contracting, doing construction contracts which admittedly don't fit classically under this indefinite supply sort of contract, but why not this time? Well, Your Honor, if you refer to FAR 16.5, which addresses indefinite delivery contracts, of which indefinite delivery, indefinite quantity is one of the types, it speaks in terms of supplies and services. And it speaks in terms of delivery orders being issued, which are for supplies, and task orders being issued for services. No one has argued that this is a supply contract, and I believe the government concurs. However, the government has argued, and the lower court found, that this could fit within the description of services, and therefore task orders could apply to it. But traditionally task orders are identifiable tasks that are measured in terms of hours. We're talking here about the construction of multi-million dollar buildings. Is your contention that the term services never can cover construction of buildings? Yes, Your Honor. I mean, there is a term that's used, although it's not found in the FAR, of construction services, which might apply to things like repair. So your position is that the word term services never could include construction? That's correct, Your Honor. And if so, even though within FAR, there are various places where it says services, parenthesis, including construction, and services, parenthesis, excluding construction. So that at least suggests to me that generally, the word services may or may not include construction, depending on the particular circumstances. I agree, Your Honor, but I think there's an explanation. Of course, the FAR is quite voluminous. The terms acquisition, which is defined as supplies and services, including construction, for example, is used thousands of times in the FAR. In those few instances where the terms, parenthetically, including construction or excluding construction are used, it seems to me it's because there was a reason to make it very clear that this is one of those cases that we're not talking about construction. But if you go to FAR 16.5, supplies and services seem to have very specific meanings. It would have been very easy for the drafters of the FAR in 16.5 to have said supplies and services, including construction, or just supplies and services and construction. When was that FAR provision originally drafted, do you know? A long time ago? Your Honor, I traced it back as far as the Armed Services Procurement Regulations, the ASPR, and I was unable to- I raise this question because it seems to me at the time it was drafted, no one ever thought about this type of contract. You said it would have been easy if they intended to include construction when it was drafted to have put that in, and I suggest to you the reason they didn't put it in is they weren't using it at the time they drafted these regulations. That makes a lot of sense, Your Honor. Let me ask you a different question. Isn't the real question in this case whether you have to find something in FAR that specifically authorizes the use of this type of procurement or whether it's enough that there's nothing in FAR or anywhere else that prohibits the use of this type of contract? Well, I think that certainly is a key question, and Your Honor, I've always looked at the Federal Acquisition Regulations as a system of procurement that is quite explicit in what it allows agencies to do. That's the only way you can have any regularity or orderliness. When you take something that's always been applied to supplies and services and has not been used to construction, it seems to me that at the very least you need to go to the FAR Council and get a deviation and have the FAR Council consider whether or not this is something that could be interpreted or included because it's a new practice and procedure. And in and of itself that may not be harmful. But why can't the government, conceding everything you say is correct, that 16.5 doesn't apply to construction, and you make a good point on that, but why can't the government innovate, save money by having repetitive contracts, contractors with expertise having done it many times do it again? Well, Your Honor, the innovation is certainly encouraged in the FAR, and I think it's mentioned in FAR 1.2, but of course it says there that the innovation is encouraged in those instances where something is not otherwise addressed in the FAR or prohibited by law and regulation. It's not prohibited, right? There's not an express prohibition. So we're still in the innovation provision, then why can't this be an innovation? Because, Your Honor, this is innovation in the name of expedience, and it brings about a rather dramatic harm which gets into the other major issue in this case, a major harm to someone like my client, who is a small business contractor, who because of the way these discrete construction projects have been packaged, is now denied the opportunity to compete for $300 million worth of work over a three-year period. I think it's very important for the Court to recognize that when this solicitation was put on the street, it was certainly advertised as a MATOC. The offerors were told that there would be a seed project on which they would submit a proposal if given the opportunity, and that that seed project would have a range of 25 to $100 million, far beyond in terms of that range the capacity of small business contractors who in this particular classification have a size standard of $31 million. They were not told, however, how many projects there possibly could be over that three-year period. They were told that there could be a minimum of $10,000 worth of work, or a maximum of $301 million worth of work. If the FAR doesn't prohibit it, why can't the government save 20% of its expenses and 30% of its scheduling, as it purports to do here? Well, in that regard, Your Honor, it's interesting that the first award that was made was actually 20% over the government estimate, but putting that aside... But then I suppose they will argue that they pick it up on the other end, right, when they get more efficient? Well, except, Your Honor... When it's repeated for the 15th time, you've got efficient contractors who know what they're doing and they're saving money. Well, except, Your Honor, the efficiency would only come into play if you had one contractor doing multiple projects. I think one of the problems in this procurement was that there was an anticipation that perhaps an award would be made to one. My client actually raised an earlier protest because the initial solicitation reserved the right to issue a single award task order contract. And because of the great emphasis on multiple award task order contracts in the Federal Acquisition Streamlining Act, the government changed its position and amended the solicitation and said it would award two or more. Well, that's within the government's discretion, isn't it? Oh, yes, certainly to award two or more. Contractors it's going to use for a particular project? Yes, but addressing Judge Rader's question, the economies of scale, for example, that might be achieved or the lessons learned come into play when you have one contractor, say for example, doing nine projects. You might even have that come into play of two each do four or three each do three. In this particular procurement, there's no guarantee of anything more than the initial seed project. The government might not award any of the others or it might decide to award them outside of this MATOC procurement as single, standalone contracts. Certainly no contractor going in is going to plan on purchasing materials for other barracks buildings that he might build in a different location that have not been awarded to him. So there's certainly no opportunity to save money on the purchase of materials. But let me tell you, the problem I have with the argument you're making is that it sounds to me to be an argument that this was an unwise policy for the government to adopt and really the government should, the court shouldn't have procured this thing that rested on the stakes and so on. But it's not our function to second guess the way the court procured this property. Our function is to see whether in procuring it the court acted within its authority. Yes, your honor, I understand. But I believe it goes, with all due respect, beyond policy. I think what the government has done here was violated the Small Business Act, which does encourage full and open competition and opportunities for small business contractors. You set aside a good bit of this work for small business, didn't it? No, your honor. There have been some set-asides which are a very small percentage of the total dollars. But those set-asides are for categories such as small disadvantaged business, service-disabled veteran-owned businesses, and those disadvantaged types of contractors. The vast majority of small business concerns in this country are not disadvantaged. They are people who I would refer to as regular small businesses. And they are the group that when the small business program was first enacted, the Congress was trying to protect and provide opportunities for. My client does not fit into one of those set-aside categories. But he is one of almost 15,000 small business contractors in this category, most of whom cannot participate in this packaged procurement of discrete construction projects. One of the interesting things about this, and though it was not advertised, but it did appear in the government protected record, was that seven of the nine anticipated projects were well within the small business size standard. My client could have bid on those individual projects. He could have obtained the bonding. He had the capability to perform those projects, as did thousands of others. Here you have a situation where three very large contractors are now finding themselves in basically a closed shop. They only have to worry about competition from each other, the three of them, for up to $300 million worth of work over a three-year period that may happen or may not happen. While a contractor like my client, who certainly wanted to have the opportunity to submit proposals or bids on a number of these projects, is absolutely left out in the cold. There is no way he can participate in a $300 million procurement over a three-year period. So not only do I think, Your Honor, that the policy is unwise, I think it flies directly in the face of what the Small Business Act is all about. And particularly at a time like we're in right now, where you have an economic stimulus package and the government trying to foster the creation of jobs, it certainly makes little sense for the federal government at the same time to restrict competition to narrow opportunities and to eliminate, of all groups, small business contractors. That's effectively what's happened here. Any further questions? All right. Thank you. Thank you. Mr. Edelshick. May it please the Court. Good morning. The trial court correctly denied this bid protest because the Army Corps of Engineers had a lawful and rational basis for this procurement. The Corps spent years analyzing the best way to go about this procurement and made a finding that IDIQ contracts were, quote, necessary, unquote, to meet the Army's requirements. Anything in FAR 16.5 that permits construction contracts? Yes, Your Honor. What if we recognize that supplies and services specifically does not include construction as it does elsewhere in the general provisions of FAR? Under the IDIQ section, we see nothing about supplies or services with any parentheticals about construction at all, suggesting that there's no construction aspect of IDIQ contracts. We do not believe that that's the correct interpretation of Part 16. I would refer, Your Honor, to 16.000, which says that Part 16 describes the types of contracts that may be used in acquisitions. What does that say about? In essence, Part 16 is a menu of those types of contracts that may be used for acquisitions. Well, if you go to the definition section of the FAR 2.101, contracts, acquisitions are specifically defined. Well, but that's the general provision that applies to all the sections, of course. You're going to have to throw your laundry list into the definition section, but where in IDIQ does it specifically have anything to do with construction contracts? It's notably only about supplies and services. The 16.504 speaks in terms of supplies and services. There's no question. We do, as we lay out in the briefs, Your Honor, we do believe that services includes construction. I take it your answer, perhaps, to Judge Rader might be that that provision is not a limiting provision, but a grant of authority provision, and that the fact that it doesn't specifically refer to construction contracts cannot be treated as saying it precludes them, that you've got to look elsewhere to see whether there's anything in this whole statutory scheme that precludes the use of these contracts of acquiring new construction. That's right. That's correct, Your Honor, and indeed the definition section of the FAR 2.101 provides that these definitions apply throughout the FAR unless the context clearly indicates otherwise, and there is no prohibition on the use of IDIQ contracts for construction. You've heard that conceded by Mr. Payne here today, and there's certainly no provision in the FAR that would specify the use of a particular type of contracting vehicle. So what you are left with is the menu of contracting options for the agency in Part 16. The use of terms acquisitions, contracts, services, we believe all of these include construction. One point that I'm not sure if it came through in the briefs, but I'd like to say a few words about it is Part 37.101, the definition of service contracts that is relied upon heavily by Tyler in their briefs, and Tyler makes the argument, well, the word construction does not appear in 37.101. Well, even if there is some relevance for Part 16 that can be gleaned from Part 37, if we take a look at the actual words that are used in the regulation, we see the term contract, which by definition includes construction. We see discussion of the overhaul and repair of supplies as a service contract. Well, supplies are defined to include buildings, and so 37.101, the provision that speaks about service contracts, is talking about the overhaul and repair of buildings. That sounds an awful lot like construction. So there are construction notions weaved throughout the FAR, weaved throughout these defined terms, and there's certainly no prohibition on these. Isn't there kind of a common sense element here? I mean, IDIQ contracts, as far as I've looked at them for many years, have been for bullets and uniforms, things you don't know how many you're going to need because they get used at different variable rates. Buildings have a pretty understandable lifespan, and they don't fit into this kind of category, do they? Well, that is the essence of the policy critique that's been levied by Tyler, but what the Corps was faced with was an effort to strike a balance between a couple of different competing policies. They knew that they needed to achieve economies of scale. They needed to save a certain amount of money in order to have enough for everything to get built. They needed to rapidly have buildings constructed quicker than they ever had before because otherwise the barracks wouldn't be ready when the troops come home. So they needed those economies of scale, and the Corps found that it was essential to achieve those economies of scale in order to accomplish this mission. Now, as for IDIQs, the Corps found that, in fact, the IDIQ contracting vehicle was necessary in order to allow the Corps to achieve those economies of scale by having the same contractors building the same buildings, the same building types over and over again using standardized designs. Could the Corps have said that because of all these needs we have determined that none of these contracts should go to small businesses because they're not as efficient in our experience as large businesses? Could they have said that? They could have, Your Honor, but... That would have been proper? That did not occur in this... I understand that didn't occur. I want to find out, would you say that that would be permissible for the Corps to... In other words, we're talking about the needs of the Corps to get these things done. Could the Corps say, well, it's our best judgment that the most effective procurement of these stuff will be done by non-small business and therefore we're going to announce that no contractor of this type will be awarded to small business. I think that that finding would be permissible if the agency had a record before it that indicated... For the same record they have now but they made the judgment that the best way to get this done would be to have it done by large companies and in the light of that we don't want any small business companies because as soon as you get small business they're not as efficient all sorts of things. I just wonder, could they do that? My own hunch is that they couldn't but I gather you say they could. What it comes down to, Your Honor, is a line drawing exercise. Up to what point in size can small businesses effectively compete for this work? The Corps of Engineers, in this case after doing extensive market research, drew that line at $15 million. You will notice in the administrative record, 100% of the contracts below that $15 million threshold were awarded as set-asides to small businesses. Above that $15 million threshold, the Corps found that small businesses were not traditionally building large barracks. That this was a size that was beyond the reach of small businesses. The question becomes, where is the appropriate line to be drawn? The Corps drew it at $15 million. Under those circumstances, we do believe it is appropriate that small businesses, for the most part, it shouldn't be surprising did not get awarded this IDIQ contract, even though they were free to participate. Instead of $15 million could they have drawn the line at $50,000? Your Honor, the market research conducted by the Corps concerning bonding capacities of small businesses and so forth indicated that $15 million was the appropriate place to be drawn. So if this was our record and they had drawn it at $50,000 it would not be supported by the record. The Corps followed the research. The Corps also had to, back to Judge Rader, your question about the innovative use of the IDIQ contract, the Corps also wanted flexibility. The barracks requirements continue to evolve as the Army reconfigures forces around the globe. As you can imagine, that is a rather complex endeavor. The IDIQ contract specifically provides flexibility in both quantities and delivery scheduling. So as requirements evolve the Corps is able to take advantage of the flexibility afforded by the IDIQ contracting vehicle. And back to the issue of protecting small businesses that Judge Friedman, you had identified, the Corps was acutely aware of small business concerns and did its best to promote small business notwithstanding the fact that these were big projects beyond the reach of most small businesses. The Corps redesigned this procurement to carve out of the barracks and set aside administrative offices that originally were proposed to be included in the barracks. They carved them out as separate freestanding buildings, creating a $93 million set-aside opportunity for small business. They also required, as a requirement for anyone bidding on this project, there was a subcontracting plan that was required that would provide 70% of the subcontracting work to small businesses. The Corps found that 70% for subcontracts was reasonably achievable and mandated that for... Under that theory I take it that the compiler might still qualify to do some of the subcontracting under this? Certainly. There's nothing that would prevent them from participating as the Small Business Act contemplates as a subcontractor associated with this procurement. Yeah. The margins are a bit different for subcontractors than for contractors, right? Yes, sir. You've cut them out of a pretty significant part of their business. I mean, the realities are there's a big difference between a subcontract and a contract, right? That's right, Your Honor. So, ultimately, in this case, Tyler disagrees with the balance of these competing considerations that was struck by the Corps, but we submit that there's a rational and legal basis for this procurement. Does the Court wish me to address the issue of the bundling and consolidation statutes? It's up to you. Well, at this point, I will conclude then and ask the Court to affirm the judgment of the trial court, and we'll stand on the briefcase. All right. Thank you. Judge Rader, you're absolutely correct. My client is a prime contractor and is not particularly interested in subcontracting because of just the reason you stated margins. The Small Business Act, in fact, promotes opportunities for small businesses as prime contractors. Recognizing that, the market research that the government refers to here certainly was not very exhaustive. There were four or five industry forums attended by a few hundred contractors. No indication of how many of them came from within this particular industry classification. There were some questions on the internet. If anything, it was a rather cursory survey of what was out there and most certainly did not test the attitude of either the industry generally or the small business community generally as to how they would feel about being excluded from competition on projects such as this. The $15 million threshold that's mentioned by counsel for the government is far below the $31 million size standard for this type of construction. My client's bonding is well in excess of that. As a matter of fact, it approaches $50 million in the aggregate as do many other small business contractors. My client and many like him can build $15 million projects and $30 million projects. They just can't do nine of them at once. As a matter of fact, I do wonder if getting these things done as quickly as possible is really what this is all about. The government could have issued nine procurements and had all nine of them built at the same time. There's nothing about packaging them this way that indicates that it's going to be any cheaper or any faster or any better. All it really does is create a closed shop for a few very, very large businesses. We're now in a wonderful situation. There's nothing that indicates so, but the question really is whether the Corps exceeded the proper bounds of its judgment in concluding to the contrary. Once again, I'm bothered. It sounds as though we're being asked to second guess the kind of judgments that only the procurement agency can make. How helpful is it going to be to the procurement agency to have this type of procurement rather than having a group of individual contracts for perhaps one or two barracks or whatever it is? Your Honor, I'm not suggesting that the Court should usurp legitimate exercise of procurement authority by the agency, but I do believe that the Court should get involved when it appears as though they're using a procedure in the FAR that was never really intended and doesn't fit well for construction and even more importantly, doing it in such a way that violates the Small Business Act. Thank you. Thank you, Your Honor. Case is submitted. All rise.